IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DIANNA JOHNSON,<br><br>    Plaintiff,<br><br><br><br><br>    vs.<br><br><br>CITY OF MURRAY, a political subdivision of the State of Utah,  and PETER A. FONDACO, in his official and individual capacities,<br><br>     Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Case No. 2:10-CV-1130 TS |

This matter is before the Court on Defendants Murray City (the "City") and Peter Fondaco's Motion for Summary Judgment.  For the reasons set forth below, the Court will grant Defendants' Motion.

I.  FACTUAL BACKGROUND

The following facts are either uncontroverted or, where controverted, are construed in the light most favorable to the nonmovant Plaintiff.  Immaterial facts and factual averments not properly supported by the record are omitted.

A.      PLAINTIFF'S HIRING

Plaintiff began work for the City at its animal shelter (the "shelter") as an Animal Control

Officer in 1998.  The shelter operated under the direction of the City's Police Department.  On

March 23, 1998, Johnson completed an Application for Employment with the City, which she

signed to acknowledge that:

> I understand that this employment application and any other City documents are
> not contracts of employment and that any oral or written statements to the contrary
> are hereby expressly disavowed and should not be relied upon by any prospective
> or existing employee.[1]

Additionally, the City's Employee Handbook contains the following contract

disclaimer:

> This Handbook is provided to inform and acquaint employees with the City's
> policies, procedures, and practices.  Neither this Handbook, employment with the
> City, nor the maintenance of supervisory or other policies or procedures shall be
> construed as constituting a promise from or contract of any kind with the City,
> either express or implied, regarding any of the matters addressed in any such
> handbooks or policies.[2]

Although the above contract disclaimer is contained within the current online Employee

Handbook, Plaintiff claims that the disclaimer is not within the hard copy Employee Handbook

she received when she was hired.  The City's Employee Handbook expressly provides that "City

policy prohibit[s] the harassment of employees on the basis of race, color, age (40 and over) sex,

pregnancy, [or] gender . . . ."[3]

---

[1]Docket No. 26 Ex. B, at MC0004.

[2]*Id.* Ex. C, at 2.

[3]*Id*. at 1.

B.     PLAINTIFF'S 2003 COMPLAINTS

In 2000, Cory Bowman became the supervisor of the City's Animal Control Division, where he supervised Plaintiff and two other Animal Control employees.  Plaintiff alleges that Mr. Bowman was verbally abusive to the employees he managed and would yell at them about their work.  Although Mr. Bowman would yell at both men and women, he would move closer to women and attempt to physically intimidate them.  Additionally, Plaintiff alleges that Mr. Bowman was more verbally abusive to women and would call them names.  For all but the first year of Mr. Bowman's employment at the shelter, all of the shelter employees other than Mr. Bowman were female.

In May of 2003, Plaintiff and her coworkers in Animal Control, Lonnie Bennett and Jessica Wright, complained to Dale Whittle, the City's Human Resources Director, about Mr. Bowman.  They complained about the  work environment and behavior they believed was inappropriate towards animals.  Although Plaintiff told Mr. Whittle that she believed that Mr. Bowman was hostile towards her because she was a woman, she said that she couldn't say for certain because there had never been a male employee that Mr. Bowman respected in the office.

Shortly after receiving the complaint in 2003, the City assigned a police lieutenant, Sam Skaggs, to take a direct supervisory role over the Animal Control Division.  The conditions improved during the time that Lieutenant Skaggs was acting as a supervisor for the shelter.  About ten months later, Lieutenant Skaggs was promoted to another division of the Police Department and, as a result, his direct supervisory duties at Animal Control ceased.  After the

2003 complaint, Plaintiff alleges that Mr. Bowman demanded that she and her coworkers talk to no one but him about work related problems.

C.     PLAINTIFF'S 2008 COMPLAINTS

Plaintiff did not complain about Mr. Bowman's treatment of her or animals again until October of 2008.  Plaintiff alleges that this was because Plaintiff and her coworkers thought that the City was alright with the work atmosphere, and that her coworkers were afraid of losing their jobs if they complained.

In July of 2004, Assistant Chief of Police Craig Burnett was given responsibility over Animal Control.  In this capacity, Burnett was Mr. Bowman's direct supervisor.  Assistant Chief Burnett, in turn, reported to Defendant Chief Fondaco.  On October 7, 2008, Plaintiff complained to Burnett that Mr. Bowman was verbally abusive to his coworkers and had mistreated animals.

Plaintiff's complaint included the following description of an incident in which Mr. Bowman yelled at her.  On September 30, 2008, Plaintiff saw a poster for a missing cat that matched the description of a cat currently at the shelter.  Plaintiff called the woman who put up the poster, and the woman came to pick up her cat.  Mr. Bowman was angry that Plaintiff had called the woman, and did not want to return the cat.  Plaintiff alleges that Mr. Bowman held the cat down, blew on it and hissed at it in front of the cat's owner and Plaintiff.  After the woman left, Mr. Bowman yelled at Plaintiff for calling the woman about her cat.

Chief Fondaco directed Assistant Chief Burnett to conduct an investigation.  On October 18, 2008, Plaintiff supplemented her complaint to Assistant Chief Burnett via email to report that Mr. Bowman had thrown "[an animal] carrier towards where [she] was standing" and later

allegedly "kicked the carrier out from under [her] hand" twice.  Plaintiff said that she did not

make this part of her initial complaint because she had forgotten about it.  Additionally, Plaintiff

said that Mr. Bowman cussed at her and called her names, but she could not "remember enough

to state it."[4]  This incident occurred on August 7, 2008.

Much later, in 2009, Plaintiff clarified her allegation to specify that Mr. Bowman had

called her a "bitch" and a "cunt" after he threw the animal carrier towards where she was

standing.  Plaintiff did not tell Burnett about these details during his 2008 investigation.  Plaintiff

alleges that Mr. Bowman called her a "bitch" on a weekly basis prior to receiving sexual

harassment training in 2004.  However, after 2004, Plaintiff alleges that Mr. Bowman only called

her a "bitch" when he threw the carrier towards her and on one other occasion.

Assistant Chief Burnett investigated the incident and obtained additional written

complaints from Plaintiff's coworkers, Ms. Bennett and Ms. Arantes.  As indicated by their

written complaints, Plaintiff, Ms. Bennett, and Ms. Arantes believed that Mr. Bowman lacked the

ability to effectively supervise animal control and that he was abusive towards them and towards

the shelter's animals.  Plaintiff and her coworkers complained that the "verbal harassment,

intimidation, degradation, [and] demoralization . . . has grown to a point that once again things

have become intolerable."[5]

Plaintiff alleges that Mr. Bowman continued to regularly scream at her and her coworkers

and intimidate them, often screaming at them just inches from their faces.  Although Mr.

---

[4]*Id.* Ex. L, at 1.

[5]*Id.* Ex. N, at MC 463.

Bowman would yell just as loudly at men, he would call only women "stupid" and lean in only when he yelled at women.

Additionally, Plaintiff alleged that Mr. Bowman would regularly abuse animals and euthanize them early. Among these allegations of animal abuse, Plaintiff provided an audio tape to Assistant Chief Burnett which contained the following account from an incident that is alleged to have occurred in or about 2002:

> West Jordan had had a little kitten, a brand new day old kitten—I don't remember the exact circumstances of this, but Jerry Gonzales was holding the kitten and for some reason, [Mr. Bowman] got mad. I wasn't there at the time, so I only heard this from Jerry. But for some reason, [Mr. Bowman] got angry at that kitten meowing or something and he took the kitten from Jerry and there is a procedure called cervical dislocation, where you're literally breaking their neck. You're supposed to be properly trained to do it and actually, you're really not supposed to do it on kittens. It's supposed to be done on birds and some small animals like rats, mice, things like that. But, for a long time, we didn't have any injection ability and so [Mr. Bowman] euthanized our kittens that way. So I could understand why he'd think that was acceptable to euthanize that way, but he literally ripped the kitten's head off in front of Jerry.[6]

Ms. Bennett told Assistant Chief Burnett this particular kitten had just survived being put in a carbon monoxide gas machine, may have been in distress, and that Mr. Bowman's conduct was intended for euthanasia purposes. However, this form of euthanasia was not a practice of the City and she considered it to be unethical.

The City investigated Plaintiff's complaints, and the shelter employees were all interviewed about Mr. Bowman's behavior and his capabilities as a shelter employee. Although some statements were made that Mr. Bowman's coworkers only wanted Mr. Bowman to be

---

[6]*Id.* Ex. I, at 1.

demoted, Plaintiff alleges that Mr. Bowman's coworkers were clear that Mr. Bowman should not be allowed to work in the shelter at all.

Mr. Bowman was told orally and in writing that retaliation would not be tolerated. Additionally, Chief Fondaco met with all employees of the Animal Control Division to tell them that he would not tolerate retaliation. However, Plaintiff informed Assistant Chief Burnett that Mr. Bowman had made comments that imply Mr. Bowman intended to retaliate.

On or about December 11, 2008, Chief Fondaco conducted a Pre-disciplinary Hearing with Mr. Bowman as a required procedure pursuant to City policy. Later that day, Chief Fondaco made the decision to demote Mr. Bowman from his position as Animal Control Supervisor to the rank of Animal Control Officer and gave a Police Sergeant, Deven Higgins, responsibility to supervise the Animal Control Division effective December 15, 2008.

Chief Fondaco decided to demote Mr. Bowman to the position of Animal Control Officer because he believed he had failed as a supervisor. In particular, Chief Fondaco believed that Mr. Bowman had used profane language, displayed a bad temper, and had been uncivil and disrespectful towards his coworkers.

D.    PLAINTIFF MOVES TO THE NIGHT SHIFT

On February 12, 2009, Plaintiff requested FMLA leave and sent an email to Seargent Higgins asserting that "I can't keep coping with being around Cory. I had another panic attack when he walked in yesterday and I thought it was Ana until I turned around and saw him. . . . I just don't want to be around Cory anymore."[7] The City granted Plaintiff's FMLA leave request

---

[7] *Id.* Ex. U.

and hired outside legal counsel to conduct an independent investigation to determine whether the

City's demotion of Mr. Bowman had effectively ended the behavior that Plaintiff and her

coworkers complained about in October 2008.

When Plaintiff met with the City's investigator, she told her that "[Mr. Bowman]

probably hasn't [done] anything more to cause more problems that could get him in more trouble.

The damage was already done before he was demoted he was just his normal self afterwards."[8]

The City's investigator reported to the City that Plaintiff, Ms. Bennett, and Ms. Arantes

could not identify any conduct for the City's investigator following Mr. Bowman's demotion that

they believed constituted bullying, intimidation, or emotional abuse.  The City's investigator also

reported to the City that Plaintiff, Ms. Bennett, and Ms. Arantes could not identify any retaliatory

conduct by Mr. Bowman following his demotion.  As a result, the City decided not to take any

further disciplinary action with respect to Mr. Bowman's employment.

In March of 2009, while still on leave, Plaintiff sent the City a letter indicating that she

wanted to return to work with a modified work schedule so that she could "be assured of not

having to see [Mr. Bowman] for a while."[9]  In this letter, Plaintiff told the City she had been

having panic attacks and had Post Traumatic Stress Disorder.[10]  Plaintiff testified that after she

proposed the idea of working a modified schedule, Assistant Chief Burnett met with her to find

---

[8]*Id.* Ex. E, at 41.

[9]*Id.* Ex. W.

[10]*Id.*

out what she would like to do with her work schedule.  Plaintiff told Burnett that she could work a noon to 8:00 p.m. shift.

On April 7, 2009, Plaintiff wrote to Chief Fondaco to request an ADA accommodation of a no contact order with Mr. Bowman and to obtain a schedule change to the latest shift possible. Chief Fondaco told Plaintiff that he could not guarantee no contact with Mr. Bowman because there were only four employees in Animal Control and, as a result, contact may be necessary.  On April 6, 2009, Plaintiff returned from FMLA leave and began work on the noon to 8:00 p.m. shift that had been created for her.

After her schedule was changed, Plaintiff participated in a meeting with the other employees of Animal Control, including Mr. Bowman.  Following this meeting, Plaintiff requested to Sergeant Higgins that she not be required to be in meetings with Mr. Bowman. Sergeant Higgins granted Plaintiff's request, and did not require her to attend any meetings where Mr. Bowman was present.  Thereafter, Plaintiff only saw Mr. Bowman about twice a month. Plaintiff testified that, as of early May 2009, she believed that the modified work schedule provided by the City had "worked" to address her concerns.

However, on May 6, 2009, Plaintiff reported for the first time to Sergeant Higgins that Mr. Bowman would allegedly glare at her when no one else was around, probably once or twice a month.  Additionally, Plaintiff reported her suspicion that Mr. Bowman was taking papers on her desk and turning them over.  Plaintiff also told Sergeant Higgins that she needed additional leave, and the City granted her FMLA leave request.

The City investigated Plaintiff's complaint about Mr. Bowman by asking him whether he ever glared at Plaintiff or whether he had handled any papers on her desk.  Mr. Bowman denied the alleged conduct.  Because the City was not able to verify Plaintiff's allegation, it took no further disciplinary action with Mr. Bowman's employment.  However, the City warned Mr. Bowman again that retaliation would not be tolerated.

On May 29, 2009, Plaintiff returned to work from FMLA leave and continued to work her noon to 8:00 p.m. shift.  Shortly thereafter, on June 17, 2009, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of sex, and retaliation for complaining about discrimination.[11]

On July 7, 2009, Plaintiff met privately with Chief Fondaco.  During this meeting, Plaintiff claims that Chief Fondaco told her that the City had received a solicitation from Salt Lake County to take over animal control operations.  Plaintiff alleges that Chief Fondaco said "I have an EEOC complaint sitting on my desk.  And you keep telling us what your doctors are saying and I want those things to stop."[12]  Plaintiff further alleges that Chief Fondaco said "[y]ou know, if you keep digging holes, then I will replace the department."[13]  Although these comments were made in private, Plaintiff's coworker, Ms. Bennett claims that Assistant Chief Burnett later told her she was collateral damage of the outsourcing process.[14]  Ms. Bennett also claims that

---

[11]Docket No. 3 Ex. A, at 1-2.

[12]Docket No. 26 Ex. A, at 175.

[13]*Id.*

[14]Docket No. 49 Ex. 8, at 138.

Chief Fondaco had told her that the outsourcing was all due to one person, although he did not specify who that person was.[15]

During this same meeting, Plaintiff also told Chief Fondaco that the Animal Control Division was not functioning as a group and that "no one is on the same page now.  No one is communicating.  Four people are doing four different things."[16]  Plaintiff testified that at this point there were problems in Animal Control that were unrelated to Mr. Bowman.  Specifically, Plaintiff testified that Ms. Bennett and Ms. Arantes "kept disagreeing" on whether particular animals were "rescue worthy" and that "basically there was no cohesion to the unit."[17]  As a result of these problems, Plaintiff said that Animal Control was not providing an "ideal" service and could have been doing better.[18]

Later, in mid-July 2009, Plaintiff alleges that Chief Fondaco met with the entire Animal Control Division to tell them that he "was upset with animal control in general . . . .  He told us we had to work together.  And then said if he continued to have any problems, sorry, he was going to replace the entire department.  And he had brought that proposal from Salt Lake County with him.  And he held it up in the air and waved it."[19]

---

[15]*Id.* at 161-62.

[16]Docket No. 26 Ex. A, at 176-78.

[17]*Id.* at 177-78.

[18]*Id.* at 177-81.

[19]*Id.* at 189.

On October 7, 2009, Plaintiff obtained a report from her physician stating that she was suffering from "Depression, PTSD, severe anxiety, and panic attacks causing insomnia, fatigue, headaches, abdominal pain, rash, hives, nightmares unless she takes sleeping pill[s], chest pain, [and] shortness of breath."[20]  Plaintiff requested and was granted additional FMLA leave time. On October 11, 2009, while on leave, Plaintiff asked Chief Fondaco that she be moved to another location in the City as an ADA accommodation.  Chief Fondaco informed Plaintiff that there were no job openings in the City at that time.  Chief Fondaco also told Plaintiff that "the City does not have sufficient information on which it could conclude that you have a disability."[21]

On November 16, 2009, while Plaintiff was on FMLA leave, the City received a letter from Plaintiff's lawyer indicating that Plaintiff would like to return to work, but only if she is guaranteed no contact with Mr. Bowman.  The City responded to Plaintiff's request by creating an even later shift especially for her, 4:00 p.m. to midnight (the "night shift"), which removed the possibility of any contact between Plaintiff and Mr. Bowman.  Plaintiff did not want to work the night shift and requested that Chief Fondaco ask Mr. Bowman if he would come in earlier or work the night shift himself.  The City did not ask Mr. Bowman to move shifts.  Assistant Chief Burnett stated:

> That would have been punitive. [Mr. Bowman] has seniority and had the right to bid shifts by seniority.  So for us to have moved [him], yeah I think that might have been brought up. . . .  But [he] wasn't asking for another shift.[22]

---

[20]Docket No. 49  Ex. 10, at 1.

[21]Docket No. 26 Ex. BB.

[22]*Id.* Ex. M, at 63-64.

Although the City did not move Mr. Bowman's shift, on December 2, 2009, Chief Fondaco made clear to Plaintiff that she did not have to work the night shift, and could elect to continue to work the noon to 8:00 p.m. shift if she liked. Plaintiff then chose to work the newly-created night shift, feeling that she had no choice if she wanted to avoid contact with Mr. Bowman. Although Plaintiff did not enjoy working the night shift, she testified that she did not feel that her reassignment to the night shift was based on her gender.[23] Working the night shift effectively kept Plaintiff away from Mr. Bowman, and Plaintiff agreed that she felt better as a result. However, on December 23, 2009, Plaintiff filed a second EEOC complaint, alleging that her assignment to the night shift was an act of retaliation by the City in violation of the Americans with Disabilities Act of 1990 ("ADA").[24] She alleged that she had been retaliated against both for seeking an accommodation for a disability and for filing a prior EEOC complaint.[25]

E.      THE TRIBUNE ARTICLE

In December of 2009, Plaintiff began meeting with Nate Carlisle, a reporter with the Salt Lake Tribune (the "Tribune"), to report to him that Mr. Bowman was verbally abusive to his coworkers and had mistreated animals. As a result, on February 2, 2010, the Tribune published an article titled "Animal control worker says ex-boss cruel to pets."[26]

---

[23]*Id.* Ex. A, at 246.

[24]Docket No. 3 Ex. A, at 3.

[25]*Id.*

[26]Docket No. 26 Ex. EE.

The Tribune article reported that Mr. Bowman had decapitated a kitten, used pepper spray on dogs, and euthanized animals before the mandatory waiting period. The article also stated that Mr. Bowman was demoted in December 2008 and that Plaintiff "has since decided she would like Mr. Bowman fired or kept from working with animals."[27]  Additionally, the  article claimed that the City retaliated against Plaintiff for complaining about Mr. Bowman by putting her on the night shift.  Against the wishes of Chief Fondaco, Mr. Bowman resigned approximately one week after the February 2, 2010, article was published.

Mayor Dan Snarr felt that following the Tribune article, the public lost confidence in the City's ability to run animal control.  The City received many complaints from citizens after the Tribune article was published.  Chief Fondaco, Mayor Snarr, and City Council members spent time answering phone calls and dealing with the public backlash that came after the article was printed.[28]  Mayor Snarr directed these complaints to Chief Fondaco, who was charged with responding to them.[29]

On February 2, 2010, Jan Wells, Mayor Snarr's Chief of Staff, sent the following email to the City Council members:

> We have had many calls today about this article.  Just for your information, it was written with information from [a] disgruntled employee who has filed legal action against the City.  The account is strictly hers and is not accurate.  [Chief Fondaco] is handling the calls on this and has talked with the Humane Society and No More Homeless Pets who verify that dealings they have had with Murray Animal

---

[27]*Id.* at 2.

[28]*Id.* Ex. D., at 110-11; *id.* Ex. FF, at 42-43; *id.* Ex. GG, at 10-11; *id.* Ex. HH; *id.* Ex. JJ.

[29]*Id.* Ex. D, at 110-11.

Control have been positive with no evidence of the concerns raised.  Also, an independent consultant did a review of our Animal Control last year and found no employee problems.[30]

F.     THE DECISION TO OUTSOURCE

At the same time, the 2010 budget year was the most difficult year that the Mayor and the City Council could remember.  By early 2010, the City Council determined that it would not resolve the City's budget shortfall by raising taxes and fees.  Instead, the City Council decided at this time to cut an additional 5% of the City's expenses.  To this end, in February of 2010, the Murray City Council instructed Mayor Snarr that he needed to make significant additional cuts from his proposed budget.

Mayor Snarr sought the input of City department heads, including Chief Fondaco, who helped prepare the budget.  Prior to this time, as early as the summer of 2009, Chief Fondaco had received inquires from Salt Lake County about the possibility of the City outsourcing its animal control services.  Mayor Snarr and Chief Fondaco discussed outsourcing the City's animal control services as a means of reducing the budget.  As a result, Mayor Snarr made the decision to do a Request for Proposal ("RFP") to determine whether outsourcing animal control services would save the City money.  The City had previously outsourced many other services to third parties.

Led by Carol Heales, the City Recorder, and Chief Fondaco, the City formed a review committee to consider any responses received by the City from its RFP about animal control. The review committee included Ms. Heales, Chief Fondaco, Assistant Chief Burnett, Sergeant

---

[30]Docket No. 50 Ex. 14.

Higgins, and Pat Wilson, the City's Finance Director.  On March 4, 2010, the City sent an RFP to Salt Lake County and West Jordan to determine the cost that these governments would charge for the provision of animal control services and the circumstances under which they would provide those services.

After Mr. Bowman's resignation in mid-February 2010, the Animal Control Division was down to two employees, Plaintiff and Ms. Bennett.  Ms. Arantes had resigned in December of 2009.  On April 9, 2010, Plaintiff's lawyer sent a letter to the City to complain that her client's workload was too much and demanded that the City take measures to reduce Plaintiff's workload.  The letter alleged that the stress of being abused by Mr. Bowman had been replaced by new stress resulting from the shelter being short staffed and the possibility of the shelter being outsourced.

In addition, the City received numerous complaints about the lack of response from animal control, and Chief Fondaco was forced to devote police resources to animal control functions, leaving the police department shorthanded for its regular responsibilities.[31]  The City contacted West Jordan Animal Control to make arrangements to have it assist Murray City Animal Control.  Plaintiff claims that these arrangements were not sufficient to alleviate her heavy workload.  The City did not believe it should hire additional employees at that time, knowing that if the City Council decided to contract with another municipality, that entity would need to assess, determine, and fill its own specific staffing needs.

---

[31]Docket No. 26, at 41.

On April 22, 2010, Plaintiff's lawyer wrote to the City to request that the shelter be allowed to use volunteers or police cadets to relieve the workload.  The letter requested the assistance as a means of accommodating Plaintiff's disabilities, including PTSD, anxiety, depression, and panic disorder.  In late April of 2010, Plaintiff requested additional leave.  The City again denied that Plaintiff had a disability, and stated that "right now, most of [the City's] employees are under stress and overworked."[32]

On May 18, 2010, Sergeant Higgins delivered a memorandum to Plaintiff that described the steps the City would take to reduce her workload, including: 1) reducing the hours the shelter was open to the public, 2) removing Plaintiff's responsibility for licensing animals, 3) removing Plaintiff's responsibility to respond to calls in the field, and 4) making arrangements with West Jordan Animal Control to provide assistance when needed.  The City did not allow Plaintiff to use volunteers to help reduce her workload.  Plaintiff also states that she wanted to be able to respond to calls in the field, and was upset about being restricted from doing so.

On May 20, 2010, Plaintiff's doctor provided a letter to the City stating that the workload reductions described in Sergeant Higgins' memorandum appeared to be sufficient to reduce Plaintiff's previous problems at work.  Plaintiff never complained to the City that the workload reduction measures taken by the City were not sufficient to address her workload problems. Shortly after the City implemented the workload reduction measures, Plaintiff wrote to Sergeant

---

[32]Docket No. 50 Ex. 19, at 1.

Higgins that "I would like to report up through the chain of command that I am feeling much better and we have been able to keep up with the workload."[33]

Meanwhile, the City's review committee continued its work reviewing the RFP responses provided by West Jordan and Salt Lake County.  In conducting its review of the RFP responses, the review committee claims it considered two main factors: quality of service and savings to the City.  To help with its decision, the City hired an independent financial consultant, David Miner with Municipal Bond Consulting, Inc., to review the RFP submissions provided by West Jordan and Salt Lake County and to render an opinion as to whether or not the City would save money by outsourcing animal control services.  On May 20, 2010, Mr. Miner submitted his written report to the City concerning his financial analysis of the proposals submitted by West Jordan and Salt Lake County.  Mr. Miner opined that the savings over a five-year contract with West Jordan would total $477,629 and that the savings over a five-year contract with Salt Lake County would total $610,290.

In conducting his analysis, Miner communicated with Ms. Heales and Mr. Wilson (the City's Director of Finance), who provided the City's financial information to him.  Mr. Wilson reported to Miner that the City's personnel costs for Animal Control totaled $246,799 including base salary, overtime, social security, insurance, retirement benefits, and workers compensation insurance.  Ms. Heales believed that this number included an amount for only three employees, and not a fourth employee supervisor.  On May 13, 2010, Ms. Heales instructed Mr. Miner that the personnel costs provided to him did not include an amount for a supervisor employee and

---

[33]Docket No. 26 Ex. PP.

needed to be adjusted to reflect an additional amount of $68,000 for the salary and benefits of this fourth employee.

However, Ms. Heales was mistaken, the personnel cost figure had already included the correct employee cost.  As a result, an additional $68,000 for the salary and benefits of a fourth employee should not have been added to Mr. Miner's assumptions.  Accounting for this difference, Mr. Miner has now revised his opinion to state that the City should have expected to see a cost savings of $256,418 with Salt Lake County and a cost savings of $123,757 with West Jordan, over the life of a five-year contract.

Before Mr. Miner was able to correct the mistake in his report, on June 8, 2010, the City's review committee recommended to Mayor Snarr that the City outsource its animal control operations by contracting with West Jordan.  The committee summarized Mr. Miner's financial analysis for the Mayor, and explained that, although Salt Lake County offered greater cost savings, West Jordan would provide the better service by maintaining two animal control officers within the City's existing Shelter.  Additionally, the City's communications and data transfer systems were compatible with those used by West Jordan and not with Salt Lake County.

On June 11, 2010, the Mayor's Office prepared a memorandum to the City Council, signed by Mayor Snarr and Chief Fondaco, recommending that the City Council approve an Interlocal Agreement with West Jordan for the provision of animal control services.  Mayor Snarr and Chief Fondaco explained that the City had "been experiencing an unfavorable public perception of its Animal Control services . . . .  In order to effectively perform Animal Control

services, the City needs to have positive interactions with its residents."[34]   Additionally, Mayor
Snarr and Chief Fondaco explained that "the City, like other cities and counties, is facing budget
shortfalls.  This year, there has been an intense effort to find ways to cut expenditures and save
money."[35]   The June 11, 2010, memorandum included as attachments the RFP, the review
committee's recommendation, and Miner's financial analysis.

At the June 15, 2010, City Council meeting, the City Council heard from Chief Fondaco,
Plaintiff's lawyer, and Ms. Bennett, among others.  All four of the present members of the City
Council (Krista Dunn, James Brass, Jared Shaver, and Darren Stam) then voted to approve an
Interlocal Agreement with West Jordan City for the provision of animal control services.  The
City Council members testified that they examined the proposal to outsource animal control
operations and made their own independent assessment about what was in the best interests of
the City.[36]  The City Council had previously rejected many of Chief Fondaco's budget requests
over the years, and testified that they do not simply rubberstamp his recommendations.[37]

In making their individual decisions, the City Council members relied on Mr. Miner's
independent financial analysis showing that the City would save $477,629 over the course of a
five-year period if it outsourced animal control operations to West Jordan.  The members of the
City Council also stated that they believed that the City was suffering from an unfavorable public

---

[34]*Id.* Ex. TT, at 1.

[35]*Id.*

[36]*Id.* Ex. GG, at 46-48; *Id.* Ex. HH, at 2; *Id.* Ex. II, at 2; *Id.* Ex. JJ, at 2.

[37]*Id.* Ex. HH, at 2; *Id.* Ex. II, at 2-3; *Id.* Ex. JJ, at 2-3.

perception of its ability to manage animal control services and that outsourcing these services would address this concern.[38]

On June 24, 2010, with its Animal Control Division eliminated, the City notified its Animal Control employees, including Plaintiff, that their positions had been eliminated and that they would be laid off as part of a reduction in force effective June 30, 2010.  West Jordan took over the operations of the shelter on September 1, 2010.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[39]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[40]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[41]

## III.  DISCUSSION

Plaintiff brings eleven different claims against Defendant Murray City and two claims against Defendant Peter Fondaco.  These claims will be considered in turn below.

---

[38]*Id.* Ex. GG, at 46-48; *Id.* Ex. HH, at 2.

[39]Fed. R. Civ. P. 56(a).

[40]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[41]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

A.      TITLE VII DISCRIMINATION

Plaintiff's first claim alleges gender and racial discrimination in violation of Title VII by Defendant Murray City.  Plaintiff alleges both individual incidents of discrimination and a hostile work environment.  As there is a different analysis for a hostile work environment claim than for a claim based on individual discriminatory actions, these claims will be evaluated separately.

As a preliminary matter, it must be noted that Plaintiff's racial discrimination claim must fail as a matter of law because she has not alleged any racial discrimination against herself personally.  Plaintiff is not a member of any race that she alleges was discriminated against. Instead, her allegations are that she heard discriminatory remarks made about a coworker.  "We have never recognized this as a valid theory of discrimination under Title VII . . . .  If unease on observing wrongs perpetrated against others were enough to support litigation, all doctrines of standing and justiciability would be out the window."[42]

1. INDIVIDUAL INCIDENTS

"In states in which a state agency has authority to investigate employment discrimination ("deferral states"), Title VII requires claimants to file a charge of discrimination within 300 days of the alleged unlawful employment practice.  Utah is a deferral state."[43]

 "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"[44]  "[D]iscrete discriminatory

---

[42]*Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1180 (7th Cir. 1998).

[43]*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 n.1 (10th Cir. 2003).

[44]*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act."[45] Therefore, in order for the claim to be actionable, it "must be filed within the . . . 300-day time period after the discrete discriminatory act occurred."[46]

Plaintiff's charge was filed with the EEOC on June 17, 2009.  Any incident on which a claim could be predicated must therefore have occurred on or after August 21, 2008.  Plaintiff's only discrete allegation of gender-based discrimination occurring after August 21, 2008, is the City's reassignment of Plaintiff to the night shift.  However, this claim must fail because Plaintiff has failed to allege any evidence that this was the result of gender-based discrimination.  Indeed, in her deposition, Plaintiff admits that she is not alleging that the city put her on the night shift because of her gender.[47]

The undisputed facts show that Plaintiff was originally reassigned to a 12:00 p.m. to 8:00 p.m. shift upon her request for a later shift so that she would not have contact with Mr. Bowman. Likewise, her reassignment to the night shift came about as a result of her request to have no contact with Mr. Bowman.  Plaintiff had the option of returning to an earlier shift if she wanted to, although she would have had to risk contact with Mr. Bowman if she chose to do so.

The only link between the shift change and gender is based on the fact that her shift was moved rather than Mr. Bowman's.  However, the simple fact that Mr. Bowman is a male and

---

[45]*Id.* at 113.

[46]*Id.*

[47]Docket No. 26 Ex. A, at 246.

Plaintiff is a female is not sufficient for a jury to find that this was discrimination based on gender.  Plaintiff was the one requesting an accommodation and a new shift was created for her. Given that Plaintiff does not allege that any gender-based comments were made in connection with her reassignment, and given that Plaintiff's personal belief is that this reassignment was not made on the basis of gender, this claim fails.

2.  HOSTILE WORK ENVIRONMENT

Unlike claims based on individual incidents of discrimination, a discrimination claim based on a hostile work environment "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"[48]  "It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.  Such claims are based on the cumulative effect of individual acts."[49]

> It does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.[50]

Although only one act contributing to the claim need occur within the filing period, "that act alone need not rise to the level of actionable harassment as long as it is a part of the ongoing violation."[51]  However,

---

[48]*Morgan*, 536 U.S. at 117.

[49]*Id.* at 115 (internal citations omitted).

[50]*Id.*

[51]*Derijk v. Southland Corp.*, 313 F. Supp. 2d 1168, 1173 (D. Utah 2003).

if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, *such as certain intervening action by the employer*, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.[52]

"To determine whether separate acts are part of the same practice, we look to the type, frequency, and timing of the acts, as well as to the perpetrator of the acts."[53]  "[A] series of alleged events comprises the same hostile environment where 'the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'"[54]

As reasoned above, Plaintiff has not alleged any individual incidents occurring after August 21, 2008, that could rise to the level of actionable discrimination.  However, the Court need only find an act that is part of an ongoing violation in order for a hostile work environment claim to survive, even if that act alone is not actionable.

On May 9, 2009, Plaintiff reported that Mr. Bowman would allegedly glare at her once or twice a month when no one else was around.  Additionally, she claimed that he would overturn papers on her desk while she was away.  Even assuming that these allegations are true, they do not appear to be the same practice as any earlier continuing hostile work environment based on gender discrimination.  "Title VII does not establish a general civility code . . . .  Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American

---

[52]*Id.* (quoting *Morgan*, 536 U.S. at 118) (internal quotations omitted).

[53]*Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005).

[54]*Id.* (quoting *Morgan*, 536 U.S. at 120).

workplaces is not the stuff of a Title VII hostile work environment claim."[55]  There does not seem to be any allegations of a relation between Plaintiff's gender and the glares or paper-turning.  Additionally, this behavior was separated from earlier incidents of harassment by the City's actions of demoting Mr. Bowman and altering Plaintiff's shift.  Accordingly, neither of these actions are sufficient to allow the Court to consider any time-barred elements of a hostile work environment claim.

 Plaintiff also alleges that Mr. Bowman yelled at her after August 21, 2008, and alleges one specific incident that occurred on September 30, 2008.  Plaintiff alleges that Mr. Bowman yelled at Plaintiff for calling the owner of a cat being held at the shelter.  Mr. Bowman told her to never contact any owners who put a poster on the shelter's board.  When the owner came to pick up the cat, Mr. Bowman appeared to deliberately distress the cat in front of the owner and his coworkers.  Afterwards, Mr. Bowman yelled at Plaintiff for calling the woman about the cat.

However, there are no allegations that this incident involved any gender-based discriminatory language or actions.  Although Plaintiff acknowledges that Mr. Bowman would yell at both women and men, in earlier incidents she claims he would move closer to women and attempt to physically intimidate them.  There are no allegations that Mr. Bowman did so here.  Although Mr. Bowman yelled at Plaintiff, there is no evidence that he did so in a different manner than he would at a man, nor is there any evidence that the basis of his yelling was gender.  Instead, it appears from the evidence that Mr. Bowman was yelling about a work policy he

---

[55]*Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012) (internal citations omitted).

wanted enforced.  As objectionable as Plaintiff may have found Mr. Bowman's treatment of animals, allegations of cruelty to animals and allegations that Mr. Bowman is a bad person do not constitute gender discrimination.

As there were neither discrete acts of gender discrimination nor any acts contributing to the claim of gender discrimination based on a hostile work environment that occurred within the statutory time period, the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's claims for discrimination under Title VII.

B.      TITLE VII RETALIATION

In order to establish a prima facie case of retaliation, Plaintiff must show that: "'(1) [Plaintiff] engaged in protected opposition to discrimination; (2) [Plaintiff] suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.'"[56]

If Plaintiff is able to establish a prima facie case, the burden shifts "to the employer to produce a legitimate, nondiscriminatory justification for taking the disputed employment action."[57]  "If the employer provides a legitimate, non-discriminatory justification for the action, the burden shifts back to the employee to provide evidence showing that the employer's proffered reason is a pretext."[58]

---

[56]*Petersen v. Utah Dep't. of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001)).

[57]*Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (citing *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003)).

[58]*Id.*

27

It is not disputed that the charge of discrimination that Plaintiff filed with the EEOC on June 17, 2009, meets the first prong of the test.  Plaintiff alleges that Murray City retaliated against her by (1) forcing her to work the night shift, and (2) outsourcing the operations of the animal shelter, resulting in the termination of Plaintiff's employment.  These two claims will be discussed in turn below.

1.  NIGHT SHIFT

In order to establish that she suffered an adverse action Plaintiff "must show that the 'employer's challenged action would have been material to a reasonable employee,' which . . . means that it would likely have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[59]

Plaintiff argues that working the night shift disrupted her family life and made it so that she could not see her thirteen-year-old child or her husband.  Working the night shift made it so that Plaintiff worked on her own and had trouble coordinating work with her day-shift coworkers.  Although Defendants argue that a shift change does not constitute an adverse action, a reasonable jury could find that under the circumstances, this change in shift time could be material to a reasonable employee such that they would be dissuaded from making a charge of discrimination.

Finally, in order to establish her prima facie case, Plaintiff must show a causal connection between the filing of her complaint and her reassignment to the night shift.  "A retaliatory motive

---

[59]*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006) (quoting *Washington v. Ill. Dep't. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).

may be inferred when an adverse action closely follows protected activity.  However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."[60]  The Tenth Circuit has found that when the time between the protected activity and the adverse employment action was three months, the plaintiff could not establish causation without additional evidence.[61]

In this case, Chief Fondaco gave Plaintiff the option of either working the night shift or a shift during which she would have contact with Mr. Bowman on December 2, 2009, over five months after Plaintiff filed her complaint with the EEOC.  Plaintiff does not allege additional facts establishing a causal connection between the complaint and assignment to the night shift. Instead, the undisputed evidence is that the night shift was created in response to a letter from Plaintiff's lawyer stating that she would only return to work if she was guaranteed no contact with Mr. Bowman.

Nevertheless, Plaintiff alleges that the creation of the night shift was a punitive action because Assistant Chief Burnett stated that reassigning Mr. Bowman to the night shift "would have been punitive. [Mr. Bowman] has seniority and had the right to bid shifts by seniority."[62] Plaintiff also alleges the actions were retaliatory because Chief Fondaco would not allow Plaintiff to come in early on days when Mr. Bowman was absent.

---

[60]*Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

[61]*See id.* at 1198-99; *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997).

[62]Docket No. 26 Ex. M, at 121-22.

The fact that the City felt it would have been punitive to move Mr. Bowman's shift when he had seniority and had not requested a change does not mean that the City intended it to be punitive to give Plaintiff the option to move shifts when she was requesting no contact with a coworker.  Furthermore, requiring Plaintiff to work the hours she was assigned once she had chosen a shift does not appear to be punitive.

However, even if the Court were to assume that Plaintiff could establish that the shift was punitive, she has not provided evidence that it was connected to the EEOC complaint.  Instead, all evidence indicates that the night shift was created and enforced in response to Plaintiff's requests for an accommodation for no contact with Mr. Bowman.  Indeed, even if Plaintiff were able to establish a prima facie case, this evidence demonstrates that the City had a legitimate, non-discriminatory reason for taking the action, and Plaintiff has not shown that the City's reason for creating the night shift position were pretext.  Therefore, this claim fails.

2.  OUTSOURCING

a.  *Causal Connection*

There is no dispute that Murray City's outsourcing of the operations of the animal shelter, ultimately resulting in the termination of Plaintiff's employment, was an adverse employment action.  Here, viewing the evidence in the light most favorable to Plaintiff, she has provided evidence on which a jury could find a causal connection between her EEOC complaints and the outsourcing of the animal shelter's operations.

In Plaintiff's deposition, she alleges that July 9, 2009, a few weeks after filing her EEOC complaint, she had a conversation with Chief Fondaco in which he told her he had an offer from

Salt Lake County for a proposal to outsource the City's animal control services.  Plaintiff claims

that in her conversation with Chief Fondaco, "[h]e said, "Due to this—you know, I have an

EEOC complaint sitting on my desk.  And you keep telling us what your doctors are saying and I

want those things to stop.' And he said, 'You know, if you keep digging holes, then I will replace

the department.'"[63]

Plaintiff's testimony is further supplemented by the deposition testimony of her coworker,

Ms. Bennett, who claims that Assistant Chief Burnett told her she was collateral damage,[64] and

that Chief Fondaco had told her that this was all due to one person.[65]  Taking all of this evidence

in the light most favorable to the Plaintiff, a reasonable jury could find a causal connection

between her EEOC complaints and the outsourcing of the City's animal control services.

### b. Legitimate, Non-discriminatory Reasons

Defendants have offered two legitimate, non-discriminatory reasons for the outsourcing

of Murray City's animal control services: (1) outsourcing would achieve significant cost savings

in a time of extreme budget pressure; and (2) outsourcing would alleviate the unfavorable public

perception of the City's abilities to manage animal control services.  The undisputed evidence

supports both reasons.  As Defendants have offered legitimate, non-discriminatory reasons for

the outsourcing, the burden shifts to Plaintiff to show that the proffered reasons were pretext.

---

[63]Docket No. 26, Ex. A, at 175.

[64]Docket No. 49 Ex. 8, at 138.

[65]*Id.* at 161-62.

### c. Pretext

In order to establish a genuine issue as to pretext, Plaintiff must show that Defendants' "proffered non-discriminatory reason is unworthy of belief."[66]  Plaintiff may accomplish this "by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"[67]  "Summary judgment is not ordinarily appropriate for settling issues of intent or motivation."[68]

"[A] challenge of pretext requires [the Court] to look at the facts as they appear to the person making the decision to terminate plaintiff."[69]  In this case, the decision to outsource Murray City's animal control services and thereby terminate Plaintiff was ultimately made by the Murray City Council.  If Plaintiff cannot produce evidence that the stated reasons for the decision of the Murray City Council was pretext, Plaintiff must show that the "decisionmaker [gave]

---

[66]*Pinkerton v. Colo. Dep't. of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[67]*Id.* (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006)).

[68]*McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (citing *Setliff v. Mem'l Hosp. of Sheridan Cnty.*, 850 F.2d 1384, 1394 n.12 (10th Cir. 1988)).

[69]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (citing *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir. 1999)); *see Piercy*, 480 F.3d 1192, 1200.

perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate."[70]

"To prevail on a subordinate bias claim, a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process.  Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action."[71]  "[B]ecause a plaintiff must demonstrate that the actions of the biased subordinate caused the employment action, an employer can avoid liability by conducting an independent investigation . . . ."[72]  "In that event, the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated."[73]

Plaintiff has provided evidence that Chief Fondaco's stated reasons for outsourcing the City's animal control services may have been pretextual.  Plaintiff has provided evidence that the public's negative perception of the City's ability to manage animal control services came as the result of the newspaper article published on February 2, 2010.  Plaintiff cites to complaints that indicate that much of the public outcry was a result of the City's employment of Mr. Bowman and animal control's lack of responsiveness to animal control needs in the spring of 2010.  However, by this time, Mr. Bowman had resigned, and the lack of responsiveness was due, at least in part, to the fact that the City had not replaced Mr. Bowman or another animal control

---

[70]*E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006).

[71]*Id.* at 487 (citing *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004)).

[72]*Id.* at 488 (citing *English v. Colo. Dep't. of Corr.*, 248 F.3d 1002, 1011 (10th Cir. 2001)).

[73]*Id.*

employee who had quit.  Plaintiff argues that the City, by refusing to hire additional employees until the outsourcing issue had been determined, partially created one of the stated problems the outsourcing was intended to solve.

Additionally, Plaintiff has presented evidence that the cost savings numbers presented to the City were inflated.  Although Plaintiff alleges that Chief Fondaco deliberately inflated those numbers, there is no objective evidence in support of that claim.  Murray City hired an independent advisor to prepare the financial analysis, and it is his testimony, along with the testimony of others, that Chief Fondaco had no part in supplying the data in support of the financial analysis.  However, Chief Fondaco did speak before the City Council, claiming that the savings from outsourcing the animal control service would be even greater than what the financial analysis claimed.[74]  Given Chief Fondaco's alleged comments to Plaintiff that he would replace the department if Plaintiff did not stop digging holes, Plaintiff has produced sufficient evidence of weaknesses in Chief Fondaco's proffered reasons that a reasonable factfinder could find those reasons unworthy of credence.  However, this does not mean that those same reasons were pretext in the eyes of the ultimate decision-maker.

Although Plaintiff may be able to claim that Chief Fondaco's reasons for outsourcing the City's animal control services were pretextual, the ultimate decision to outsource the City's animal control services was made by the City Council.  Plaintiff has not presented sufficient evidence to show that the ultimate decision maker gave perfunctory approval of Chief Fondaco's recommendations.

------------------------------------------------------------

[74]Docket No. 26 Ex. UU, at MC1019-20.

Although Defendants admit that the proposal to outsource animal control came at the recommendation of the Mayor and Chief Fondaco, the City Council performed an independent investigation.  The City Council members testified that they were experiencing genuine budget difficulties and needed to make cuts.  The City Council members hired an independent financial analyst to provide them with their financial information, and held a council meeting at which testimony was heard from many people, including Plaintiff's attorney.  The independent financial analyst testified that he obtained his information independent of Chief Fondaco.  As all evidence suggests that the City Council made its own independent investigation into the advisability of outsourcing the City's animal control department, Plaintiff's claim for retaliation must fail as a matter of law.  Therefore, the Court will grant Defendants' Motion for Summary Judgment with regard to Plaintiff's Title VII retaliation claims.

C.      EQUAL PROTECTION UNDER § 1983

Plaintiff brings claims of gender discrimination and retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983.

Plaintiff's § 1983 claim for retaliation must fail as a matter of law.  The Tenth Circuit has found that § 1983 cannot serve as the basis for a claim of retaliation.[75]  Plaintiff concedes that her § 1983 claim for retaliation must fail.[76]

---

[75]*See Long v. Larame Cnty. Cmty. Coll. Dist.*, 840 F.2d 743, 752 (10th Cir. 1988); *Meade v. Merchs. Fast Motorline, Inc.*, 820 F.2d 1124, 1125 n.1 (10th Cir. 1987); *Tafoya v. Adams*, 816 F.2d 555, 557-58 (10th Cir. 1987) ("The right to be free of retaliatory discharge provided for by Title VII does not entitle one to relief under 1983 . . . .").

[76]Docket No. 47, at 7.

Claims asserted under § 1983  "need not be asserted within the . . . 300-day period applicable to Title VII claims."[77]  Instead, "[f]or § 1983 actions, state law determines the appropriate statute of limitations . . . ."[78]  "Utah's four-year residual statute of limitations . . . governs suits brought under section 1983."[79]

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[80]  The Supreme Court has limited the liability of municipalities under § 1983, stating that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[81]  "Instead . . . [the Court has] required a plaintiff seeking to impose liability on a municipality to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."[82]

---

[77]*Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004).

[78]*Brock v. Herbert*, 435 F. App'x 759, 762 (10th Cir. 2011) (citing *Bd. of Regents v. Tomanio*, 446 U.S. 478 (1980)).

[79]*Id.* (quoting *Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir. 1995)).

[80]*West v. Atkins*, 487 U.S. 42, 48 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

[81]*Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

[82]*Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

A policy can be based on the decisions of "officials whose acts may fairly be said to be those of the municipality."[83]  However, it is not enough to identify conduct properly attributable to the municipality.[84]  "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[85]

1. ACTIONS OF MR. BOWMAN

Plaintiff has failed to identify any City policy or custom that would allow liability to attach to the City under § 1983 for the alleged gender discrimination by Mr. Bowman.  Instead, Plaintiff alleges that City ratified Mr. Bowman's actions by being deliberately indifferent to discrimination against Plaintiff.  However, the facts do not support this claim.  The undisputed facts are that the City received Plaintiff's October 2008 complaint against Mr. Bowman, that the City performed an investigation, and that the City then relieved Mr. Bowman of his supervisory responsibilities.  The City then hired an independent investigator to ensure that Mr. Bowman's alleged bad behavior had stopped.

Plaintiff does not allege any further discrimination by Mr. Bowman following his demotion.  However, Plaintiff does allege that he continued to retaliate against her by glaring at her a couple of times a month and by overturning papers on her desk while she was away.  Again,

---

[83]*Id.* at 403-04.

[84]*Id*. at 404.

[85]*Id.*

Plaintiff cannot show that any City policy or custom allowed this to happen.  Instead, the City investigated the incidents but was unable to find any evidence of discrimination.  Plaintiff's evidence of a discriminatory City custom or policy is insufficient to allow liability to attach to the City pursuant to § 1983 for Mr. Bowman's alleged gender discrimination.

      2.  ACTIONS OF CITY OFFICIALS

Plaintiff alleges that Chief Fondaco is a policy maker for the City, and that Chief Fondaco's decision to place Plaintiff on the night shift and his role in outsourcing the City's animal control services are attributable to the City.  Likewise, Plaintiff alleges that the roles of the Mayor and City Council in outsourcing the animal control department are acts of official policy.  However, even assuming that these people are all policy makers for the City, these claims must fail because the facts do not support a claim of gender discrimination.  Plaintiff has not alleged any facts that tie either of these actions to gender discrimination.  Instead, Plaintiff alleges that these actions were retaliation for Plaintiff's complaints.  However, as noted above, § 1983 does not provide a basis for Plaintiff's retaliation claims.

Therefore, the Court will grant Defendants' Motion for Summary Judgment as it relates to Plaintiff's Equal Protection claims under § 1983.

D.     DUE PROCESS

Plaintiff alleges that Defendants Murray City and Chief Fondaco's decision to outsource the animal control department was a violation of Plaintiff's procedural and substantive due process rights in that they deprived her of a property interest in her employment without due process.

1.  SUBSTANTIVE DUE PROCESS

Substantive due process protections "apply to transgressions above and beyond those covered by the ordinary civil tort system; the two are not coterminous."[86]  "Given the latitude we ordinarily afford government actors operating in their official capacities, we recognize constitutional torts only 'in the narrowest of circumstances.'"[87]  "The tortious conduct alleged 'must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power . . . .  [It] must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'"[88]  "Under this framework, due process protections are accorded primarily 'to matters relating to marriage, family, procreation, and the right to bodily integrity.'"[89]

Plaintiff has cited no legal precedent for a finding of a violation of a party's substantive due process rights in a case like this one.  The conduct alleged in this case simply is not above and beyond that covered by the ordinary civil tort system to the degree it shocks the conscience.  Therefore, the Court will grant Defendants' Motion for Summary Judgment as it relates to Plaintiff's substantive due process claim.

---

[86]*Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008).

[87]*Id.* at 1221 (quoting *Becker v. Kroll*, 494 F.3d 904, 922 (10th Cir. 2007)).

[88]*Id.* (quoting *Livsey v. Salt Lake Cnty.*, 275 F.3d 952, 957 (10th Cir. 2001)).

[89]*Id.* at 1220 (quoting *Albright v. Oliver*, 510 U.S. 266, 272 (1994)).

2.   PROCEDURAL DUE PROCESS

Plaintiff argues that because the City's decision to outsource its animal control department ultimately resulted in Plaintiff's termination, it violated her procedural due process rights.  "To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process."[90]  "Ordinarily, 'one who has a protected property interest is entitled to some sort of hearing before the government acts to impair that interest, although the hearing need not necessarily provide all, or even most, of the protections afforded by a trial.'"[91]  "In the context of public employment, this 'principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his [or her] employment.'"[92] "A full evidentiary hearing is not required prior to a determination."[93]  "At a minimum, it must provide the employee notice and an opportunity to respond."[94]

Normally, a procedural due process claim arises when an employee is terminated for some form of misconduct without being given an adequate opportunity to respond to the

---

[90]*Guttman v. Khalsa*, 669 F.3d 1101, 1113-14 (10th Cir. 2012) (quoting *Hatfield v. Bd. of Cnty. Com'rs for Converse Cnty.*, 52 F.3d 858, 862 (10th Cir. 1995)).

[91]*Id.* at 1114.

[92]*Nard v. City of Okla. City*, 153 F. App'x 529, 533 (10th Cir. 2005) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).

[93]*Id.* (citing *Loudermill*, 470 U.S. at 545).

[94]*Lovinger v. City of Black Hawk*, 198 F.3d 258 (10th Cir. 1999) (citing *Loudermill,* 470 U.S. at 546).

allegations.  This is not a case where the City terminated Plaintiff as a result of Plaintiff's misconduct.  Instead, Plaintiff was terminated as a result of the City outsourcing the animal control department.  Even if the Court assumes that Plaintiff has a property interest such that she is entitled to procedural due process regarding the City's decision to outsource the animal control department, Plaintiff's claims must fail.  It is undisputed that the City held a hearing on June 15, 2010, during which Plaintiff, through her attorney, appeared and was able to present evidence disputing the City's reasons for outsourcing the animal control department.  The City's decision was not made until after hearing evidence from all interested parties, and provided Plaintiff with due process notice and opportunity to respond.

Therefore, the Court will grant Defendants' Motion for Summary Judgment as it relates to Plaintiff's procedural due process claims.

E.      ADAAA CLAIM

Plaintiff alleges that the City violated the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") by failing to accommodate the known disabilities of Plaintiff.  The ADAAA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment."[95]  Under the ADAAA, prohibited discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ."[96]

---

[95] 42 U.S.C. § 12112(a).

[96] 42 U.S.C. § 12112(b)(5)(A).

In order to make a claim under the ADAAA, Plaintiff "must demonstrate that [she] '(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."[97]  The term 'disability' means "a physical or mental impairment that substantially limits one or more major life activities of such individual."[98]  "To establish an ADA disability under subsection (A), our precedent indicates that a plaintiff must 'articulate with precision' both her impairment and the major life activity it substantially limited."[99]  "[T]he court is to analyze only those activities identified by the plaintiff."[100]

In her memorandum in opposition, Plaintiff alleges that she has been documented as having several impairments, including "PTSD, severe anxiety, panic attacks . . . causing insomnia, fatigue, headaches, abdominal pain, rash, hives, nightmares unless she takes sleeping pills, chest pains, shortness of breath."[101]  Although Plaintiff does not specifically identify any major life activities, Plaintiff's claims, facts, and requested accommodations appear to be regarding the major life activity of working.

---

[97]*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037-38 (10th Cir. 2011) (quoting *Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008)).

[98]42 U.S.C. § 12102(1)(A).

[99]*Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010) (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003)).

[100]*Barlow v. C.R. England, Inc.*, 816 F. Supp. 2d 1093, 1104 (D. Colo. 2011) (quoting *Doebele*, 342 F.3d at 1129).

[101]Docket No. 47, at 12.

The Tenth Circuit has long recognized that "[t]o be disabled in the major life activity of working, an employee must be 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'"[102]  Although the ADA Amendments Act of 2008 ("ADAAA") provides a broader definition of disability than has traditionally been considered by the Court,[103] the Tenth Circuit has found that this amendment did not "discuss or modify the definition of the major life activity of working."[104]  Instead, the definition for working was provided by EEOC regulations interpreting the ADA, which were not modified until May 24, 2011.[105]  Prior to May 24, 2011, the regulation provided:

> the term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.[106]

Although this language was eliminated in the 2011 modifications, the Tenth Circuit has found that "the Interpretive Guidance goes on to explain that the 'broad class of jobs' restriction remains in place even after the amendment to the regulations."[107]  The court concluded that:

---

[102]*Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 834 (10th Cir. 2011) (quoting *E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1162 (10th Cir. 2006)).

[103]ADA Amendments Act of 2008, PL 110-325, 122 Stat. 3553 (2008).

[104]*Allen*, 455 F. App'x at 834.

[105]*Id.* at 835.

[106]29 C.F.R. § 1630.2(j)(3)(i) (2010).

[107]*Allen*, 455 F. App'x at 835.

based on our existing case law, Supreme Court case law, the applicable statute, and the regulations, that to show a disability in the major life activity of working, [plaintiff] was required, even after the enactment of the ADAAA and the modified EEOC regulations, to demonstrate that she was substantially limited in performing a class of jobs or broad range of jobs in various classes as compared to most people with comparable training, skills, and abilities.[108]

In the present case, Plaintiff has failed to demonstrate that she is substantially limited in performing a class of jobs or a broad range of jobs in various classes as compared to most people with comparable training, skills, and abilities. Instead, the evidence and Plaintiff's requests for accommodation indicate two limitations on her ability to work. First, she claims that she was unable to "work with her abusive coworker, Mr. Bowman, who was the cause of her disabilities."[109] Second, she was unable to work without "being provided with adequate staff or volunteers to operate the animal shelter when its staff was reduced by half."[110] If Plaintiff could perform her job functions for a different supervisor, she could perform her job, and thus does not qualify as disabled under the ADA.[111] Similarly, an argument that Plaintiff could not perform her job while the office was understaffed is only an argument that Plaintiff could not perform her

---

[108]*Id.*

[109]Docket No. 18, at 15.

[110]*Id.*

[111]*See Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524-25 (7th Cir. 1996); *see also Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir. 1997) ("Siemon's mental impairment merely prevents him from working under a few supervisors within the organizational structure of one major corporation. . . . [T]his is far too narrow to constitute a 'class of jobs.'"); *Bouck v. Utah Dep't. of Transp.,* 2006 WL 2527426, at *7 (D. Utah Aug. 28, 2006) ("Bouck admits that a transfer to a different job under a different supervisor would have solved the problem. This means he did not have an impairment which substantially limited one or more major life activities.").

specific job under specific circumstances.  This does not equate to a showing the Plaintiff is unable to perform in a broad range of jobs.  Thus, Plaintiff has not met her burden to show she is disabled under the ADA.

In her memorandum in opposition, Plaintiff also notes that "[i]nsomnia, in and of itself, affects a major life activity."[112]  It appears that Plaintiff is alleging an impairment to the major life activity of sleeping.  However, Plaintiff has provided the Court with no factual allegations in support of this other than a doctor's note indicating that she suffered from "PTSD, severe anxiety . . . causing insomnia . . . [and] nightmares unless she takes sleeping pills . . . ."[113]  In *Johnson v. Weld County, Colorado*, the Tenth circuit refused to recognize or analyze a similar undeveloped argument that the major life activity of sleeping was impaired.[114]  The court noted that although the plaintiff stated that "she has suffered from nightmares and sleep disorders, she doesn't offer any evidence, as she must, suggesting how her difficulties sleeping compare to those of the average person in the general population (many of whom, of course, have nightmares or trouble sleeping).  Thus, [plaintiff] hasn't shown that her . . . sleeping troubles qualify her as disabled under the ADA."[115]  Similarly, in the present case, Plaintiff has not supplied the Court with any information regarding the frequency or severity of her insomnia or nightmares that would permit

---

[112]Docket No. 47, at 12.

[113]*Id.*

[114]594 F.3d at 1218 n.10; *see Allen*, 455 F. App'x at 31 ("Her argument concerning the major life activity of sleep was insufficiently developed in district court and is mentioned only in passing here.  Accordingly, we will give no further consideration to 'sleeping' as an alleged major life activity.").

[115]*Johnson*, 594 F.3d at 1218 n.10.

the Court to make any kind of comparison to the sleeping difficulties of the average person in the general population.  Accordingly, Plaintiff has not shown that her sleeping troubles qualify her as disabled under the ADA.

F.      UTAH PROTECTION OF PUBLIC EMPLOYEES ACT

Plaintiff claims that Murray City took adverse actions against Plaintiff in violation of the Utah Protection of Public Employees Act because Plaintiff communicated suspected violations of law, rule, or regulation.  The Utah Protection of Public Employees Act provides that:

> An employer may not take adverse action against an employee because the employee, or a person authorized to act on behalf of the employee, communicates in good faith the existence of any waste of public funds, property, or manpower, or a violation or suspected violation of a law, rule, or regulation adopted under the law of this state, a political subdivision of this state, or any recognized entity of the United States.[116]

The statute also provides that "[a]n employee who alleges a violation of this chapter may bring a civil action for appropriate injunctive relief or actual damages, or both, within 180 days after the occurrence of the alleged violation . . . ."[117]  Although Plaintiff has alleged many violations of this statute, the only alleged adverse action that occurred within 180 days of her complaint was the City Council's decision to outsource the animal control department, thereby terminating Plaintiff's position.

"To plead a claim under this Act, Plaintiff must show that (1) [she] communicated in good faith the existence of waste of public funds, property, or manpower or a violation of a law or regulation and (2) [her] employer took an adverse employment action against [her] because of

---

[116]Utah Code Ann. § 67-21-3(1)(a).

[117]*Id.* § 67-21-4(2).

said communication."[118]  Plaintiff claims that she communicated violations of state laws and City regulations when she spoke to the press.  Although Plaintiff does not specify which laws or regulations she communicated violations of, the article appears to contain allegations that Mr. Bowman engaged in animal cruelty and that he violated regulations governing the euthanization of animals.

However, Plaintiff has not provided sufficient evidence to establish a causal relationship between her communications and the City Council's decision to outsource animal control.  The only evidence that the City Council had any bias against Plaintiff comes from an email sent to the City Council from the Mayor's Chief of Staff.  The email states that the article "was written with information from [a] disgruntled employee who has filed legal action against the City."[119]  However, Plaintiff can point to no statements or actions made by the actual City Council members that indicate they held a bias against Plaintiff or that their motivation for outsourcing the animal control shelter was a result of Plaintiff's communication of suspected violations of law or regulation.  Instead, the City provides evidence that the decision was made based on other considerations after an independent investigation.  Therefore, the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's Utah Protection of Public Employees Act claim.

G.    CONTRACT-BASED CLAIMS

The animal shelter was a division of the City, "and as such, its employees are public employees.  Ordinarily, 'employment of public employees is governed by statute, not

---

[118] *Ostler v. Salt Lake City Corp.*, 2005 WL 2237631, at *3 (D. Utah Sept. 14, 2005).

[119] Docket No. 50 Ex. 14.

contract.'"[120]  However, "'circumstances may exist where the government voluntarily undertakes an additional duty beyond its normal obligation to the employee, 'in which case an implied contract arises.'"[121]

"An implied contract may arise from a variety of sources including personnel policies or provisions of an employment manual."[122]  "Relevant evidence of the intent of the parties usually 'includes the language of the manual itself, the employer's course of conduct, and pertinent oral representations.'"[123]  However, "a clear and conspicuous disclaimer, as a matter of law, prevents employee manuals or other like material from being considered as implied-in-fact contract terms."[124]

Here, Plaintiff's contractual claims are barred because Plaintiff signed a clear and conspicuous disclaimer covering the employee manual and other animal shelter policies. Plaintiff signed the following disclaimer in her application for employment:

> I understand that this employment application and any other City documents are not contracts of employment and that any oral or written statements to the contrary are hereby expressly disavowed and should not be relied upon by any prospective or existing employee.[125]

---

[120]*Cabaness v. Thomas*, 232 P.3d 486, 502 (Utah 2010) (quoting *Canfield v. Layton City*, 122 P.3d 622, 626 (Utah 2005)).

[121]*Id.* (quoting *Canfield*, 122 P.3d at 626).

[122]*Id.*

[123]*Id.* at 503 (quoting *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 56 (Utah 1991)).

[124]*Id.* (quoting *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991)).

[125]Docket No. 26 Ex B, at MC 0004.

Plaintiff does not deny that she signed the above disclaimer in her application for

employment.  Additionally, the City's Employee Handbook contains the following disclaimer:

> This Handbook is provided to inform and acquaint employees with the City's
> policies, procedures, and practices.  Neither this Handbook, employment with the
> City, nor the maintenance of supervisory or other policies or procedures shall be
> construed as constituting a promise from or contract of any kind with the City,
> either express or implied, regarding any of the matters addressed in any such
> handbook or policies.[126]

Plaintiff alleges that the employee handbook she received at the start of her employment

did not have the above disclaimer.  However, Plaintiff does not dispute that the Employee

Handbook states that the City's Personnel polices and procedures are guidelines.  Instead,

Plaintiff relies on *Cabaness* to argue that an implied contract can arise even when there is a

disclaimer.

In *Cabaness*, the court found that the following language created only a limited

disclaimer: "No contract exists between [the City] and its employees with respect to salary, salary

ranges, movement within salary ranges, or employee benefits."[127]  The court found that

> the disclaimer in this case does not contain broad and conspicuous language
> disclaiming any and all contractual liability.  To the contrary, it only disclaims
> contractual liability "with respect to" a few specifically identified items.  Indeed,
> the plain meaning of the disclaimer in this case is that [the employer] intended to
> create a contract with its employees with respect to the items in the Employee
> Manual that are not specifically listed in the disclaimer.[128]

The court then found that the clear language of the limited disclaimer in conjunction with

---

[126]*Id.* Ex. C, at 2.

[127]*Cabaness*, 232 P.3d at 503.

[128]*Id.*

49

other provisions in the employee handbook was evidence of the employer's intent to voluntarily assume certain duties to their employees, thereby forming an implied contract.[129]

The disclaimer that the City had Plaintiff sign was not a limited disclaimer like the one considered in *Cabaness.*  Instead, the disclaimer signed by Plaintiff stated that the application and "any other City documents" along with "any oral or written statements" were not contracts. This does not evince an intent by the City to create a contract with its employees like the disclaimer in *Cabaness*.  Instead, this is an example of "a clear and conspicuous disclaimer" which the Utah Supreme Court has held "as a matter of law, prevents employee manuals or other like material from being considered as implied-in-fact contract terms."[130]

Therefore, the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

H.    FMLA CLAIM

The Family Medical Leave Act ("FMLA") provides that:

any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave–

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.[131]

Plaintiff took FMLA leave in February of 2009 due to difficulties associated with

---

[129]*Id.* at 504.

[130]*Id.* at 503 (quoting *Morton Thiokol*, 818 P.2d at 1003).

[131]29 U.S.C. § 2614(a).

working with Mr. Bowman.  On March 24, 2009, Plaintiff sent a letter to Defendants requesting that she be allowed to "come back with the work schedule modified so I can be assured of not having to see Cory for a while."[132]  Although the City did not grant Plaintiff's request for absolutely no contact with Mr. Bowman, it did give her the option to take a 12:00 p.m. to 8:00 p.m. shift that it created for her.  Plaintiff does not dispute that she chose to accept this shift in order to limit her contact with Mr. Bowman.  Plaintiff took additional FMLA leave on May 6, 2009, and returned to her 12:00 p.m. to 8:00 p.m. shift on May 29, 2009.

Plaintiff took FMLA leave for a third time in October of 2009.  On November 16, 2009, Plaintiff's attorney sent a letter to Defendants, indicating that Plaintiff would like to return to work, but only if she was guaranteed no contact with Mr. Bowman.  In response, the City created a 4:00 p.m. to 12:00 a.m. shift for Plaintiff.  Plaintiff does not dispute that she was given the option of returning to work either the night shift or the 12:00 p.m. to 8:00 p.m. shift.  Although Plaintiff opposed taking the night shift, she ultimately accepted it because it was the only option given her that guaranteed no contact with Mr. Bowman.  Plaintiff feels that this was punitive because the City did not guarantee her no contact with Mr. Bowman by either firing him or moving his shift times.  Plaintiff alleges that the City admitted it was punitive because of the following explanation by Assistant Chief Burnett for why Mr. Bowman was not moved to the night shift:

---

[132]Docket No. 26 Ex. W.

That would have been punitive.  [Mr. Bowman] has seniority and had the right to
bid shifts by seniority.  So for us to have moved [him], yeah I think that might
have been brought up. . . .  But [he] wasn't asking for another shift.[133]

Plaintiff's claim that her shift changes violated the City's FMLA obligations to restore

Plaintiff to the same or an equivalent position simply cannot stand under these facts.  It is not

disputed that the City provided Plaintiff with the option of returning to her pre-leave shift each

time she returned from leave.  The FMLA does not require the City to place Plaintiff in a better

environment or give her a better shift than the one she left.  Instead, the FMLA requires an

employer to restore an employee to an equivalent position to the one the employee left, which the

City offered to do.

Plaintiff's claims for discrimination and retaliation in violation of the FMLA amount to

claims that the City discriminated and/or retaliated against the Plaintiff's actions of taking FMLA

leave by refusing to fire Mr. Bowman or move him to the night shift.  In order to establish this

claim, Plaintiff would need to show that the City was obligated to move the shift of either Mr.

Bowman or Plaintiff, and that it did not move Mr. Bowman because Plaintiff had taken FMLA

leave.  Plaintiff has not shown that the City had an obligation to move Mr. Bowman's shift, or

that it created the night shift for any reason other than the fact that Plaintiff requested no contact

with Mr. Bowman.  The fact that the City felt it would be punitive to Mr. Bowman to move his

shift in response to Plaintiff's request does not mean that it was punitive to Plaintiff to give her

the choice of taking the late shift in response to her request.  Nor is there evidence that the City

did anything as a response to Plaintiff's taking FMLA leave.  The City only made changes in

---

[133]*Id.* Ex. M, at 63-64.

response to Plaintiff's requests.

Therefore, the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's

FMLA claims.

I.      FIRST AMENDMENT CLAIM UNDER § 1983

Plaintiff claims that the City and Chief Fondaco retaliated against her First Amendment

rights to petition and speak on matters of public concern when the shelter operations were

outsourced to another city.  Freedom of speech retaliation claims are analyzed under a five step

inquiry referred to as the *Garcetti/Pickering* analysis.[134]

> First, the court must determine whether the employee speaks pursuant to [his]
> official duties.  If the employee speaks pursuant to his official duties, then there is
> no constitutional protection because the restriction on speech simply reflects the
> exercise of employer control over what the employer itself has commissioned or
> created.  Second, if an employee does not speak pursuant to his official duties, but
> instead speaks as a citizen, the court must determine wether the subject of the
> speech is a matter of public concern.  If the speech is not a matter of public
> concern, then the speech is unprotected and the inquiry ends.  Third, if the
> employee speaks as a citizen on a matter of public concern, the court must
> determine whether the employee's interest in commenting on the issue outweighs
> the interest of the state as employer.  Fourth, assuming the employee's interest
> outweighs that of the employer, the employee must show that his speech was a
> substantial factor or a motivating factor in [a] detrimental employment decision.
> Finally, if the employee establishes that his speech was such a factor, the
> employer may demonstrate that it would have taken the same action against the
> employee even in the absence of the protected speech.  The first three steps are to
> be resolved by the district court, while the last two are ordinarily for the trier of
> fact.[135]

---

[134]*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007)
(citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563
(1968)) .

[135]*Id*. at 1202-03 (quotation marks and citations omitted).

Defendants have made no argument that Plaintiff was speaking pursuant to her official duties or that her speech was not a matter of public concern.  Therefore, for purposes of the Motion for Summary Judgment, the Court will assume that Plaintiff was speaking as a citizen on a matter of public concern.

1. THE THIRD STEP

"Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged.  Courts balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"[136]  "The government has a substantial interest in ensuring that all of its operations are efficient and effective.  That interest may require broad authority to supervise the conduct of public employees."[137]  "It is well-settled that the balancing assessment must be performed by the court, not the jury."[138]

"[T]here is no easy formula for 'weighing' an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment."[139]  Nevertheless, the question is whether the employer "has an efficiency interest which would

---

[136]*Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2493 (2011) (quoting *Pickering*, 391 U.S. at 568).

[137]*Id.* at 2494.

[138]*Weaver v. Chavez*, 458 F.3d 1096, 1101 (10th Cir. 2006) (citing *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996)).

[139]*Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1333 (10th Cir. 2007).

justify it in restricting the particular speech at issue."[140]   "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose."[141]

Pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."[142]   Arguably, "the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships."[143]   This includes the danger of discrediting the office if the statement is made public.[144]   "[T]he *employer* bears the burden of justifying its regulation of the employee's speech."[145]

Defendants have provided evidence that Plaintiff's statements caused significant disruptions to the City's operations.   It is not disputed that Mr. Bowman resigned approximately

---

[140]*Brammer-Hoelter*, 492 F.3d at 1207 (quoting *Cragg v. City of Osawatomie, Kan.*, 143 F.3d 1343, 1346 (10th Cir. 1998)).

[141]*Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

[142]*Brammer-Hoelter*, 492 F.3d at 1207 (quoting *Rankin*, 483 U.S. at 388).

[143]*Id.* (quoting *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989)).

[144]*Rankin*, 483 U.S. at 389.

[145]*Brammer-Hoelter*, 492 F.3d at 1207 (citing *Connick v. Myers*, 461 U.S. 138, 150 (1983)).

one week after the article containing Plaintiff's statements was published.  Plaintiff does not

dispute that this resignation left the department with insufficient staff and was against the wishes

of Chief Fondaco.  The article also contained volatile allegations about her coworker, Mr.

Bowman, that would have otherwise been certain to have a detrimental impact on employee

relations in the shelter.  Additionally, it is undisputed that the Police Chief, Mayor, and City

Council members had to devote significant time to answering phone calls and dealing with the

public backlash that came after the article was printed.[146]  The City received numerous

complaints about the lack of response from animal control, and Chief Fondaco was forced to

devote police resources to animal control functions, leaving the police department shorthanded

for its regular responsibilities.[147]  It is clear that the City had good reason to feel the public did

not trust its management of the animal shelter, and to worry that the shelter would have greater

difficulty in performing its function if the public distrusted the shelter's treatment of animals and

was unwilling to turn to them.

Courts have routinely found that the government's interests outweigh those of the

employee when the employee's speech threatens to have a significant impact on the operational

efficiency of a department.[148]  However, unique circumstances in this case mitigate the impact of

---

[146]Docket No. 26 Ex. D. 110-11; *id.* Ex. FF, at 42-43; *id.* Ex. GG, at 10-11; *id.* Ex. HH; *id.*
Ex. JJ.

[147]*Id.* Ex. FF, at 41.

[148]*See Eaton v. Harsha*, 505 F. Supp. 2d 948, 971 (D. Kan. 2007) (finding that the City
police department's interests in efficiency and effectiveness outweighed a plaintiff's interests in
free speech when the speech caused the Police Chief to spend considerable time responding to
public outcry, could lead the public to be less likely to report crimes, and could cause internal

Plaintiff's statements.  It is clear from the record that the animal shelter had not been running efficiently or effectively for some time prior to Plaintiff's statements.  As early as July of 2009, Plaintiff reported to the City that the animal control division was unable to function as a group, stating that "no one is on the same page now.  No one is communicating.  Four people are doing four different things."[149]  Ms. Arantes, an animal shelter employee, had quit in December of 2009, leaving the shelter short-staffed even prior to the article.  The relationship between Plaintiff and Mr. Bowman was strained long before the article came out.  In light of all of the pre-existing difficulties at the shelter, it is unclear how much strife within the animal shelter itself was caused by Plantiff's speech.  To some degree, the difficulties the animal shelter was having with responding to animal control requests was due to the shelter not hiring new staff to replace Ms. Arantes and Mr. Bowman.  The parties dispute the degree to which this inability to respond to calls was a result of Plaintiff's speech rather than other concerns of the City or the City's deliberate choice.

However, even considering the mitigating factors, Plaintiff's speech had a significant impact on the animal shelter and police department's internal operations.  Mr. Bowman's resignation was a direct result of the speech.  It is not disputed that Chief Fondaco and other City officials had to devote time and resources to dealing with the public outcry.  Police resources had to be reassigned from their original purpose.  As a result, Court finds that the City and Chief

---

employee relations to be damaged); *Weaver*, 458 F.3d at 1103-04; *Jantzen v. Hawkins*, 188 F. 3d 1247, 1258 (10th Cir. 1999); *Dillman v. Winchester*, 639 F. Supp. 2d 1257, 1270 (W.D. Okla. 2009).

[149]Docket No. 26 Ex. A, at 177-78.

Fondaco's interest in promoting the efficiency of the public services they perform outweigh Plaintiff's First Amendment interests.

    2.  THE FIFTH STEP

    Even had Plaintiff's claim survived the third-step balancing test, it must still fail because Defendants have demonstrated that they would have made the decision to outsource even in the absence of the protected speech.

    Defendants argue that the City's budgetary constraints and the financial savings that it believed would result from outsourcing the animal control department demonstrate that the decision to outsource was based on efficiency reasons.  It is not disputed that the City was facing significant financial pressure and a budget shortfall.  Nor is it disputed that the City Council decided to cut 5% of the City's expenses and instructed Mayor Snarr that he needed to make significant additional cuts from his proposed budget.  It is not disputed that Mayor Snarr's suggestion to initiate an RFP to get bids from other cities with regards to the animal control services came in response to that request.  Finally, Plaintiff does not dispute that it was a common practice for the City to outsource services to other cities, and that Salt Lake County had approached Murray City as early as the summer of 2009 to see whether the City was interested in having Salt Lake County take over its animal control operations.  The Court finds that Defendants have provided undisputed facts to show that the RFP process was initiated in response to budgetary pressures and inquiries from Salt Lake County.  None of these factors are related to Plaintiff's speech.

    Defendants have not only demonstrated that the RFP process was initiated independent of

Plaintiff's speech, they have also demonstrated that the subsequent investigation and decision to outsource were made independent of Plaintiff's speech.  Defendants have demonstrated that the actual decision to outsource was made pursuant to an independent investigation by the City Council members.  Defendants have shown that the City Council members hired an independent financial analyst to provide them with financial information, and held a council meeting at which testimony was heard from many people, including Plaintiff's attorney.  Plaintiff does not dispute, and in fact argues, that the animal shelter was not operating effectively prior to her speech.  Finally, Plaintiff has not provided any evidence that the City Council members themselves were biased towards Plaintiff, or that any action taken by them was in retaliation for Plaintiff's speech.  In light of this undisputed evidence, the Court concludes that Defendants have shown that they would have made the decision to outsource even in the absence of Plaintiff's protected speech.

Therefore, because Plaintiff's First Amendment claim under § 1983 cannot survive the third or fifth step of the *Garcetti/Pickering* test, the Court will grant Defendants' Motion for Summary Judgment on this claim.

## IV.  CONCLUSION

It is therefore

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 22) is GRANTED.

The Clerk of the Court is directed to enter judgment in favor of Defendants and close this case forthwith.

DATED   November 9, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge